DR. JOHN HAGELIN FOR PRESIDENT COMMITTEE OF KANSAS; Dr. John Hagelin, Jessie Nichols, Patricia Robinson and Wanda Fern Kelly, Plaintiffs,

v.

Bill GRAVES, in his official capacity as Secretary of State of Kansas, Defendant.

No. 92–4201–R.

United States District Court, D. Kansas.

Sept. 9, 1992.

James C. Wright, Wright & Shafer, Topeka, Kan., Jay B. Marcus, John Courtade, Marcus & Courtade, P.C., Fairfield, Iowa, for plaintiffs.

Martha M. Snyder, Office of the Atty. Gen., Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

ROGERS, District Judge.

This matter is presently before the court upon plaintiffs' motion for preliminary injunction. Plaintiffs, who are members of the Natural Law Party, seek to enjoin the Secretary of State for the State of Kansas from enforcing K.S.A. 25–305, which requires that nomination petitions for independent candidates be filed ninety-one days prior to the general election. Three of the plaintiffs are candidates for political office:

Dr. John Hagelin, President of the United States; Jessie Nichols, United States Senator; Patricia Robinson, United States Representative for the Third District. The fourth is a registered voter in Kansas who wishes to vote for these individuals in the upcoming general election. Plaintiffs contend that K.S.A. 25–305 is unconstitutional under the First and Fourteenth Amendments because it violates their rights to cast effective votes and to associate for the advancement of political beliefs. Plaintiffs argue that ninety-one days exceeds the period necessary for Kansas officials to verify signatures on the nominating petitions and to prepare the ballots for the general election.

On September 3, 1992, the court held a hearing on plaintiffs' motion. Having heard the arguments of the parties and listened to some evidence, the court makes the following factual findings and legal conclusions.

FACTUAL BACKGROUND

The Natural Law Party was formed on April 20, 1992. The goal of the Natural Law Party is to bring scientific solutions to the problems of the United States. Dr. John Hagelin was subsequently selected to be the party's candidate for President of the United States. He is presently on a leave of absence from his employment as a professor of physics at the Maharishi International University in Fairfield, Iowa. In June, the party approved the candidacies of Jessie Nichols for United States Senator for the State of Kansas and Patricia Robinson for United States Representative for the Third District of the State of Kansas. The three candidates have the necessary legal qualifications for their respective offices.

Efforts were begun on June 28, 1992 to obtain the necessary signatures on nominating petitions for these candidates. On August 3, 1992, Hagelin, Nichols, and Robinson submitted nomination petitions to the office of the Secretary of State which they allege contain the following number of signatures: Hagelin—4,299; Nichols—4,250; and Robinson—4,512. The Secretary of State has indicated that these petitions con-

tained the following number of signatures: Hagelin—3,737; Nichols—4,250; and Robinson—4,347. The Secretary of State has also alleged that a preliminary review of the petitions shows the following number of valid signatures: Hagelin—2,047; Nichols—3,964; and Robinson—2,861.

On August 10, 1992, the Secretary of State's office advised the plaintiff candidates that their petitions did not contain sufficient signatures, and that the filing of the petitions was determined to be invalid. Thereafter, the plaintiffs continued to circulate nomination petitions in Kansas. On August 14, 1992, the plaintiff candidates tendered more nomination petitions to the Secretary of State. Plaintiffs allege that they submitted the following number of aggregate signatures to the Secretary of State: Hagelin—7,679; Nichols—7,716; and Robinson—7,960. The additional petitions were refused.

Independent candidates in Kansas have two avenues of getting their names printed on the ballot. First, if the candidate is a member of a party that has received "official recognition" by the State of Kansas, he may file his declaration of candidacy in June preceding the general election. See K.S.A. 25–302a, 25–305(a). This will allow the candidate to appear on the general election ballot in November. This avenue was closed to the plaintiffs here because the deadline for receiving official party recognition in Kansas was April 10, 1992, which was ten days prior to the time that the Natural Law Party was organized.

Second, an independent candidate who is not a member of a party with official status may obtain nomination petitions in order to be placed on the general election ballot. The number of signatures necessary to be placed on the ballot differs depending on the office sought. See K.S.A. 25–303. In this case, each plaintiff candidate was required to obtain the signatures of 5000 qualified voters. K.S.A. 25–303(b) and (c). The deadline for the presentation of these signatures to the Kansas Secretary of State is noon on the Monday preceding the first Tuesday of August preceding a national general election, which in this

case turned out to be August 3, 1992. K.S.A. 25–305(b). The Secretary of State has ten days, excluding Saturdays, Sundays and holidays, to determine the validity of the nomination petitions. K.S.A. 25–208a(a). If the Secretary of State declares a nomination petition invalid, the affected candidate has three days to file an objection. K.S.A. 25–308(b). The objection must then be considered within five days after notice of the objection is given to members of the panel that is responsible for deciding the objection, which consists of the lieutenant governor, secretary of state and attorney general. K.S.A. 25–308(c), (d).

The election process in Kansas is administered locally by each of the 105 counties. See K.S.A. 25–604. The time required for the production of ballots in each county varies according to the type of ballot used in that county. Some counties use voting machines while many continue to use paper ballots. Kansas law requires absentee ballots to be prepared at least twenty days prior to the general election. K.S.A. 25–1120.

The federal government, through the Department of Defense, has established a federal absentee ballot deadline. Ordinarily, this deadline is forty-five days prior to the general election. This year in Kansas the deadline is thirty days prior to the general election because of delays that occurred as a result of redistricting.

CONCLUSIONS OF LAW

The standards for obtaining a preliminary injunction are well-established. The moving party must demonstrate the following: (1) a showing that the movant will suffer irreparable injury unless the injunction issues; (2) substantial likelihood that the movant will eventually prevail on the merits; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980).

The most important of the four prerequisites here is substantial likelihood of suc-

cess on the merits because irreparable injury will be demonstrated if the plaintiffs show a substantial likelihood of success on the merits. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976).

The law is well-settled that a state has the power to engage in "substantial regulation of elections ... if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). However, ballot access restrictions implicate the fundamental rights of association and voting protected by the First Amendment, as applied to the states through the Fourteenth Amendment. *Anderson v. Celebrezze,* 460 U.S. 780, 787, 103 S.Ct. 1564, 1569, 75 L.Ed.2d 547 (1983). In *Anderson,* it was determined that the following functional test must be applied by trial courts in cases such as this:

It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. at 1570.

Recently, in *Burdick v. Takushi,* —— U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Supreme Court reaffirmed the standards set forth in *Anderson* and added the following:

Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amend-

ment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed,* 502 U.S. ——, ——, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. *Anderson, supra,* 460 U.S. at 788, 103 S.Ct. at 1569–1570; see also *id.,* at 788–789, no. 9, 103 S.Ct. at 1569–1570 n. 9.

—— U.S. at ——, 112 S.Ct. at 2063–2064.

Plaintiffs' position is that the August 3rd filing deadline operates to require them to file petitions for the offices of President, United States Senator and United States Representative far in advance of the general election, and thereby imposes unreasonable burdens on the plaintiffs' rights of political association and freedom of speech. Plaintiffs argue that the early deadline precludes Kansas voters from voting for late emerging political candidates. They also argue that the deadline is not compelled by Kansas interests. In support of these positions, they note that the period between the filing deadline for the primary election and the primary election is only 55 days, while the period between the filing deadline for the general election and the general election is 91 days. Plaintiff Hagelin also contends that the current deadline particularly discriminates against him because it may occur prior to the presidential conventions of the major parties (and did, in fact, occur this year with regard to the Republican Convention), and the Kansas laws allow the candidates of the major parties to be placed on ballots after the deadline.

The defendant contends that the deadline established by Kansas law, 91 days prior to the general election, is constitutional. The defendant argues that the state interests of voter education, prevention of fraud, avoidance of voter confusion, prevention of chaos in the party system, and administrative processing provide adequate support for the Kansas deadline.

In *Anderson,* the Supreme Court found that an Ohio statute that required an independent candidate for President to file a nominating petition in March in order to appear on the general election ballot in November was unconstitutional. The Supreme Court determined that the early filing deadline placed an unconstitutional burden on the voting and associational rights of the candidate's supporters. The Court also concluded that the interests asserted by the State of Ohio in support of its early deadline—voter education, equal treatment for partisan and independent candidates, and political stability—were not tenable. The Court found that advances in communication technology now permitted adequate voter education in a period of less than seven months. *Id.* at 797. The Court observed that the filing deadline did not promote equal treatment because a democratic or republican presidential nominee could appear on the general election ballot even if he failed to meet the primary deadline in Ohio but was thereafter nominated at the national convention. An independent candidate would receive no such second chance. *Id.* at 799. As to the political stability interest, the Court noted that the Ohio deadline did not serve as either a "sore loser" or a "disaffiliation" statute, in that it did not narrow the field of candidates for the general election, and that it was not precisely drawn to protect parties from "intra-party feuding." *Id.* at 804–05. Under the circumstances, the Court found that the March deadline did not materially advance the state's interest in political stability.

The court is unaware of any case that has dealt with the precise issue facing this court, i.e., whether a filing deadline for independent candidates of 91 days prior to the general election is constitutional. We know from *Anderson* that a filing deadline for presidential candidates of seven months prior to the general election is unconstitutional, but the *Anderson* court did not establish a constitutional maximum or minimum. In *New Alliance Party of Alabama v. Hand,* 933 F.2d 1568 (11th Cir.1991), the

Eleventh Circuit found that a deadline of April 6 for all candidates to be placed on the general election ballot in November was unconstitutional. In *Populist Party v. Herschler*, 746 F.2d 656 (10th.Cir.1984) (per curiam), the Tenth Circuit determined that Wyoming's filing deadline of 45 to 90 days prior to the general election for independent candidates was constitutional. There is no "litmus-paper test" for evaluating constitutional challenges to election laws. *Storer*, 415 U.S. at 730, 94 S.Ct. at 1279. In ruling on such challenges, "there is 'no substitute for the hard judgments that must be made.'" *Anderson*, 460 U.S. at 789–90, 103 S.Ct. at 1570 (quoting *Storer*, 415 U.S. at 730, 94 S.Ct. at 1279).

At least one court, in dicta, has suggested that a filing deadline of sixty to ninety days prior to the general election would be constitutional. In *Cromer v. State of South Carolina*, 917 F.2d 819 (4th Cir. 1990), the Fourth Circuit determined that a filing deadline for independent candidates for state offices of 70 days prior to the primary and 200 days before the general election was unconstitutional. The court provided the following guidance for establishing a deadline that would be constitutional:

> The most obvious state interest justifying any pre-election filing deadline is the need to provide a decent interval for administrative processing and for voter education. While no constitutional maximum or minimum has been developed, most states seem to have fixed on 75 to 90 days as a reasonable period to accommodate these two undoubted state interests, both as relates to primary and general elections. Looking only to those interests, a state surely could require independent candidates to declare and perfect their candidacies 60 to 90 days before a general election. Beyond that period, some other interest would seem to be needed to justify an earlier declaration of independent candidacy.

*Id.* at 825 (footnote omitted).

In support of their arguments, plaintiffs cite a number of cases in which the courts found as unconstitutional situations where independent candidates had to file months prior to major party primaries. *See, e.g., Blomquist v. Thomson*, 739 F.2d 525 (10th Cir.1984) (filing deadline for new political party of 120 days prior to primary election is unconstitutional); *Libertarian Party of Kentucky v. Ehrler*, 776 F.Supp. 1200 (E.D.Ky.1991) (in state elections, filing deadline of 119 days prior to primary election and 280 days prior to general election is unconstitutional since filing deadline in Presidential elections is 68 days prior to general election); *Libertarian Party of Nevada v. Swackhamer*, 638 F.Supp. 565 (D.Nev.1986) (filing deadline for independent candidates for federal and state offices of 90 days prior to primary election is unconstitutional); *Cripps v. Seneca County Board of Elections*, 629 F.Supp. 1335 (N.D.Ohio 1985) (filing deadline for independent candidate for municipal office of 75 days prior to primary election is unconstitutional); *Stoddard v. Quinn*, 593 F.Supp. 300 (D.Me.1984) (filing deadline for independent candidate for United States Senate two months prior to primary election is unconstitutional).

The cases cited by plaintiffs have some importance but do not specifically address the issue presented here. The cases cited by plaintiffs are not directly applicable because the State of Kansas has not established a filing deadline for independent candidates significantly prior to the primary election. Here, the State of Kansas requires that nomination petitions for independent candidates be filed only one day prior to the primary election.

We must recognize initially that the application of the balancing process established in *Anderson* depends on the public office under discussion. *Anderson* made it quite clear that a state has a less important interest in regulating Presidential elections than statewide or local elections. 460 U.S. at 794–95, 103 S.Ct. at 1573. The Court observed that in nationwide elections, a state's stringent ballot access criteria has an effect beyond its own borders: "the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States." *Id.* at 795, 103 S.Ct. at 1573. The national interest in

choosing candidates for national office "is greater than any interest of an individual State." *Id.* (quoting *Cousins v. Wigoda,* 419 U.S. 477, 490, 95 S.Ct. 541, 549, 42 L.Ed.2d 595 (1975)). Some of the contentions in this case apply equally to each of the offices sought by the plaintiffs, but some are uniquely applicable and inapplicable to the candidacy of Dr. Hagelin.

We begin by first considering the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiffs seek to vindicate. There is no question that the filing deadline imposed by the State of Kansas is a burden upon the associational rights of independent voters and candidates. It does prevent any independent candidate from gaining access to the general election ballot less than three months prior to that election. Moreover, since it applies to independent candidates for President, it places a restriction on the nationwide electoral process. However, we also note that there is no fundamental right to run for elective office. *Bullock v. Carter,* 405 U.S. 134, 142–43, 92 S.Ct. 849, 855, 31 L.Ed.2d 92 (1972). Nor is there a constitutional right to vote for a specific individual. *See Burdick,* —— U.S. at ——, 112 S.Ct. at 2067. The burden on plaintiffs is obviously significantly less than it was in *Anderson* since the deadline here is over four months closer to the general election.

We next turn to the interests asserted by the State of Kansas to justify the burden imposed by its deadline. The State has identified essentially five separate interests that it seeks to further by its deadline for independent candidates: voter education, avoidance of voter confusion, political stability, prevention of fraud, and administrative processing. We must, of course, determine the legitimacy of these interests and the extent to which the August filing deadline serves them.

Each of the goals articulated by the State is a legitimate and compelling governmental goal. We must consider whether in the context of this case these interests are sufficient to uphold the filing deadline established by the State. We shall focus upon voter education, political stability and administrative processing because the parties spent most of their arguments on these interests.

■ The State's interest in voter education is premised upon the belief that the earlier the voters receive information about the electoral field, the better the opportunity they will have for careful selection and evaluation of the respective candidates. In *Anderson,* the Court concluded that the state's legitimate interest in voter education did not justify the specific restriction on participation in a Presidential election that was at issue there. 460 U.S. at 797–98, 103 S.Ct. at 1574. The Court determined that it was "somewhat unrealistic" to suggest that in the "modern world" it takes "more than seven months to inform the electorate about the qualifications of a particular candidate simply because he lacks a partisan label." *Id.* at 797, 103 S.Ct. at 1574.

We believe that this case is distinguishable from *Anderson* both as to Dr. Hagelin and the other two candidates. We find that the August deadline does indeed further the State's interest in voter education. Despite considerable advances in technology, voters still need a reasonable time to assess the candidates, particularly independent candidates. The issues today are complex, and the ability to understand a candidate's position on a particular issue often takes time and study. While voters may not need seven months to properly assess the qualifications and positions of a candidate, we find that ninety-one days is a reasonable period.

■ Another interest identified by the State of Kansas is political stability. The State has identified the filing deadline for independent candidates as a type of "sore loser" law in that it prevents those defeated in the primary from running in the general election. We fail to see the merit of this argument since Kansas already has a "sore loser" statute. *See* K.S.A. 25–202(c) ("[n]o candidate for any national, state, county or township office shall file for office as a partisan candidate in a primary election and also file for office as an

independent candidate for any national, state, county or township office in the general election immediately following"). While the August filing deadline does serve as a "sore loser" statute in that it does prevent losers from the primary in gaining access to the general election ballot, we do not find that the setting of this deadline was part of a legislative design as a sore loser statute since the legislature had already established such a statute.

■ Next, we consider the state's interest in administrative processing. The State has indicated that this is not a major reason behind the August deadline, but it obviously has some importance. Kansas officials obviously need some period of time to verify nomination signatures, resolve challenges, and prepare the ballots. Plaintiffs have suggested that ninety-one days is not necessary to accomplish these tasks. We cannot say based on the evidence presented that ninety-one days is unreasonable.

We recognize that the primary election period is only fifty-five days, but we believe that there is at least one valid reason for the difference in the two periods: voter education. We perceive a need to allow voters additional time for voters to learn about the candidates for the general election. In the primary election, party members are voting for candidates of their own party. In addition, in most cases, they are voting in only a few races since many of the candidates are unopposed. We believe that fifty-five days provides the voters with adequate time to decide who will represent their party in the general election in a limited number of races. In the general election, the voters are deciding who will be the ultimate office holder. This often requires the voter to consider a number of candidates who come from a wide range of parties and have a wide range of ideas. Moreover, the voter is faced with casting a vote for every office on the ballot. Accordingly, the importance of the decision, coupled with the number of choices and the number of candidates, provides adequate support for the need for ninety-one days for voter education for the general election.

■ Finally, plaintiffs have argued that the deadline in Kansas places a significant restriction on, and discriminates against, independent candidates for President because it requires that nomination petitions be submitted prior to the party conventions of the Democratic and Republican parties. Plaintiffs contend that *Rainbow Coalition of Oklahoma v. Oklahoma State Election Board,* 844 F.2d 740 (10th Cir.1988) requires that the deadline for independent candidates for President be after the party conventions of the major political parties.

In *Rainbow Coalition,* plaintiffs sought to enjoin enforcement of an Oklahoma statute which imposed a deadline of May 31 for filing petitions seeking recognized party status. Candidates of recognized parties were then required to file their intention to run in the primary during a two-day period beginning the first Monday after July 4th. All recognized parties in Oklahoma are required to use the primary election to select their nominees. If a party did not have recognized status, then its candidate ran as an independent. The Tenth Circuit found that the May 31 deadline, although "troublesomely early," was constitutional. The court's comments related to the plaintiff's argument were as follows:

We find no merit to plaintiffs' contention that the district court failed to properly consider the difficulty that the May 31 deadline poses for minority party petition drives. Plaintiffs presented undisputed evidence that voters lack interest in signing such petitions until after the major parties have held their conventions, picked their candidates, and established their platforms. However, lower courts are limited in the significance they can place on such evidence in view of the Supreme Court's approval of filing deadlines on dates before the major party conventions.[9] *See, e.g., American Party [of Texas v. White ],* 415 U.S. [767] at 787 n. 18, 94 S.Ct. [1296] at 1309 n. 18 [39 L.Ed.2d 744 (1974)]; *Jenness,* 403 U.S. [431] at 434, 438, 91 S.Ct. [1970] at 1972, 1974 [29 L.Ed.2d 554 (1971)].

---

9. *We recognize that the Supreme Court did give such considerations dispositive weight in*

*Anderson, 460 U.S. at 790–96, 103 S.Ct. at 1570–73. However, Anderson is distinguishable in several material respects. The deadline challenge there arose in the context of an independent candidacy for national office. The Court pointed out that*

> "in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries."

*Id. at 794–95, 103 S.Ct. at 1573 (footnotes omitted). In this connection, we note that Oklahoma has a separate statute governing ballot access for minority candidates for President which has a July 15 deadline and requires a petition signed by 3% of the total votes cast in the last election for President. Okla.Stat. tit. 26, § 10–101.2 (Supp.1987).*

*The Court has also explained that "the political party and the independent candidate approaches to political activity are entirely different. . . . A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office." Storer v. Brown, 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 714 (1974). The state thus has a correspondingly greater interest in imposing restrictions to provide "assurance that the particular party designation has some meaning." Libertarian Party v. Florida, 710 F.2d 790, 795 (11th Cir.1983), cert. denied, 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984).*

*Id.* at 746.

We find nothing in *Rainbow Coalition* or *Anderson* that compels the states to set a filing deadline for independent candidates for President after the Democratic and Republican national conventions. We believe that the various interests articulated by the State adequately support the August deadline even when applied to presidential candidates.

In sum, we do not find that plaintiffs have demonstrated a substantial likelihood of success on the merits. The interests of the State of Kansas, particularly voter education and administrative processing, justify the minimal burden which the challenged filing deadlines placed on plaintiffs' rights. We do not believe that the ninety-one day pre-election filing deadline is unreasonable or unduly burdensome. We believe that the August deadline allows independent candidates and voters to adequately react to late developing issues. We recognize that all candidates, including independent candidates, would relish the option of waiting as late as possible to file for an office. This tactic provides a number of advantages. *See Cromer*, 917 F.2d at 830 (Wilkinson, J., dissenting). However, each state must impose some deadline in order to avoid chaos in the voting booth. We do not find that the plaintiffs have demonstrated that the August deadline in Kansas is unconstitutional. Accordingly, we must deny the plaintiffs' motion for preliminary injunction.

IT IS SO ORDERED.