Mark A. SHARP, Petitioner,

v.

The TULSA COUNTY ELECTION
BOARD, Respondent.

No. 82903.

Supreme Court of Oklahoma.

Sept. 20, 1994.

As Corrected Jan. 31, 1995.

Supplemental Opinion Granting
Rehearing Jan. 31, 1995.

Rehearing Denied Jan. 31, 1995.

Ron B. Barber, Robert J. Bartz, Joe M. Fears and E. Scott Pruitt, Barber & Bartz, Tulsa, for petitioner.

Dick A. Blakely, Asst. Dist. Atty., Tulsa, for respondent.

SUMMERS, Justice:

This is an original action in this Court seeking a writ of mandamus to the Tulsa County Election Board. The Petitioner was a candidate for School Board whose name had been removed from the ballot by the Election Board. We issued the writ and allowed the candidate's name to remain on the ballot, advising that an opinion would follow. We now vacate the writ and uphold the action of the Election Board.

Mark Sharp filed as a candidate for office on the School Board of the Jenks Independent School District No. 5. No other individual filed for the seat. After the filing period ended Hester White Tyler filed a petition with the Tulsa County Election Board protesting the candidacy of Sharp. The basis of her protest was 70 O.S.Supp.1993, § 5–113 and 5–113.1. She urged that Sharp was prohibited by these statutes from being a candidate because his wife was a teacher in the Jenks School District. The Election Board agreed and removed his name from the ballot.

Sharp then filed a petition with this Court, asking for a writ of mandamus to order the Election Board to place his name on the ballot. His petition was filed on January 25, 1994. The election was to be held on February 8, 1994. Sharp asserted (1) that the statutes were in conflict and must be resolved in favor of his candidacy, and (2) that § 5–113 was an unconstitutional violation of his right to be a candidate. These were questions of first impression. We issued the writ of mandamus to allow the election to proceed with Sharp as the only candidate, and stated in the order that an opinion would follow to resolve the issues raised by the parties.

## THE WRIT OF MANDAMUS

Because Sharp presented an arguable claim of the violation of his federal constitutional rights in a case of first impression, we chose to allow him to remain on the ballot pending our resolution of the matter. A writ

of mandamus may be issued to avoid confusion and disorder. *State ex rel. Settles v. Bd. of Educ. of Dependent School District No D–38*, 389 P.2d 356, 361 (Okla.1964) (mandamus issued to avoid the confusion caused by a legislative enactment permitting salaries for teachers who were also legislators). We have also recognized the need, on certain occasions, to maintain the status of the parties pending resolution of the merits of the case. *National Collegiate Athletic Ass'n v. Owens*, 555 P.2d 879, 881 (Okla.1976) (injunction issued to preserve the status quo); *General Motors Corp. v. Cook*, 528 P.2d 1110, 1114 (Okla.1974) (writ of prohibition denied to maintain the status quo). This Court has the authority to issue a writ of mandamus when the questions are *publici juris*, or when some unusual situation exists so that a refusal to exercise jurisdiction would work a great wrong or a denial of justice. *Clark v. Warner*, 85 Okla. 153, 204 P. 929, 931 (1922); *State v. Ross*, 76 Okla. 11, 183 P. 918, 920 (1919). The writ of mandamus here was necessary to prevent the possibility of a constitutional injustice.

## CONSTRUCTION OF THE STATUTES

In 1992, the legislature amended the statutes dealing with nepotism in school districts. Title 70 O.S.Supp.1992 Section 5–113 prohibited a school board member, or a candidate for school board to be related within the second degree by affinity or consanguinity to any other member of the board or to any employee of the school district. The reason for the anti-nepotism rule, as expressly stated in the statute, was to prohibit persons who were related from serving simultaneously on the board, and to prohibit a person from serving on the board while a close relative was employed by the school district. Section 113 also contains a "grandfather" clause which creates an exception to this rule. It allows a present member of the board to continue his or her term, and to be elected to successive terms, even if he or she is related to another board member or to a school district employee.[1]

Section 5–113.1 deals with the employment of teachers and other school district employees if they are related to a board member. Again, the statute prohibits the employment of persons related within the second degree of consanguinity or affinity unless the employee is already under contract or otherwise employed by the school district at the time the board member is elected. A teacher or employee in the latter situation may continue employment. Section 5–113.1 goes on to provide that any board member who is related within the second degree to an employee shall not participate in any personnel matter or litigation involving the related employee.[2]

---

1. The statute, in full, reads:
§ 5–113. Relation by affinity or consanguinity—Prohibition
*No person shall be eligible to be a candidate for or serve on a board of education if he or she is currently employed by the school district governed by the board of education or is related within the second degree by affinity or consanguinity to any other member of the board of education or to any employee of the school district governed by the board of education,* it being the purpose of this section both to prohibit persons who are related within the second degree by affinity or consanguinity from serving simultaneously on the same board of education of any school district of this state and to prohibit persons who are related within the second degree of consanguinity or affinity to an employee of a school district from serving on the board of education governing the school district while such relative is employed. *These prohibitions shall not apply to prevent members of boards of education who are serving on September 1, 1992, from serving the term for which they were elected or from serving successive terms for which they may be elected.*

Any member of a board of education who violates the provisions of this section shall be subject to the penalties prescribe by Sections 485 and 486 of Title 21 of the Oklahoma Statutes. (Emphasis Added)

2. Section 113.1 reads in full:
§ 5–113.1. Relation by consanguinity or affinity with school board member prohibited in employment or contracts—Exemptions—Executive sessions of board—Collective bargaining agreements
A. Except as otherwise provided herein, *no person may be employed or put under contract by a school district if that person is related to a member of the board of education of that school district within the second degree of consanguinity or affinity; provided, a teacher or employee already under contract to or otherwise employed by the school district at the time a member of the board of education to whom such teacher or employee is so related is elected or serving shall be eligible to continue the employment; provided further, a teacher or employee already under contract to or otherwise employed by the school*

Both Section 113 and 113.1 state that any person in violation of the rules shall be subject to the (misdemeanor) penalties set forth in 21 O.S.1991 §§ 485 and 486. These sections also provide that any person guilty of violating these rules shall be removed from office.

■ Sharp argues that these two statutes are inconsistent, because Section 5–113 prohibits the candidacy of a person related to an employee of the school district, while Section 5–113.1 expressly states that it is not intended to prohibit the candidacy of any person for a seat on a board of education. Tyler and the Tulsa County Election Board urge that the two are not inconsistent, that Section 5–113 deals with the eligibility requirements of school board members and candidates, while Section 5–113.1 deals with the eligibility requirements of teachers and employees.

■ The fundamental rule of statutory construction is to ascertain the intent of the legislature in enacting the law and construing so as to give effect to this intent. The provisions, if possible must be construed together to give force and effect to each other. *Public Serv. Co. v. State ex rel. Corp. Comm'n,* 842 P.2d 750, 752 (Okla.1992); *TRW/Reda Pump v. Brewington,* 829 P.2d 15 (Okla.1992). The legislative intent is determined from the language of the statute in light of its general purpose. *Oglesby v. Liberty Mut. Ins. Co.,* 832 P.2d 834, 840 (Okla. 1992). A presumption arises that the legisla-

ture expressed its intent in the statute and that it intended what it expressed. *City of Chandler v. State ex rel. Dept. of Human Serv.,* 839 P.2d 1352, 1354 (Okla.1992); *Humphrey v. Denney,* 757 P.2d 833, 835 (Okla. 1988).

In the present case it is not difficult to determine the intent of Sections 5–113 and 5–113.1. The intent of the legislature was to prevent nepotism within a school district as between the school board members and its teachers and employees. The policy behind the statutes is to avoid conflicts of interest, favoritism and the appearance of favoritism.

■ If possible, statutes are to be construed so as to render them consistent with one another. *State ex rel. Macy v. Freeman,* 814 P.2d 147, 151 (Okla.1991); *Eason Oil Co. v. Corp. Comm'n,* 535 P.2d 283, 286 (Okla. 1975). It is the duty of this Court to reconcile the different provisions of statutes, as far as practicable, to make them not only consistent and harmonious, but also to give an intelligent effect to each. *Inexco Oil Co. v. Corp. Comm'n,* 628 P.2d 362 (Okla.1981); *Trapp v. Wells Fargo Express Co.,* 22 Okla. 377, 97 P. 1003 (1908). If two constructions are possible, this Court will prefer the one that avoids conflict between the two provisions. *Roach v. Atlas Life Ins. Co.,* 769 P.2d 158 (Okla.1989).

■ Sharp's statutory construction argument may succeed only if one sentence in

district or a board member already serving at the time the relationship is established may continue in said employment or service. No member of the board of education who has resigned from the board before his or her term has expired may be reappointed to the board to complete the remainder of his or her term if a teacher or employee related to the resigned member of the board within the second degree of consanguinity or affinity was put under contract or otherwise employed by the school district after the board member resigned. The State Board of Education may exempt a person from the provisions of this subsection upon written request from that person or the local board of education.

No member of a board of education who is related to a teacher or other employee of the district within the second degree of consanguinity or affinity shall attend or participate in any regular or executive session of the board held to consider any personnel matter or litiga-

tion relating to said teacher or employee; provided however, the member may vote on collective bargaining agreements or the renewal of contracts as a group if the vote is necessary to form a quorum of the board of education members. If more than one member of the board of education is related to a teacher or employee, only the minimum number of those members which is necessary to form a quorum shall be allowed to vote. Each board of education shall adopt a written policy establishing procedures on when such a member may vote on the renewal of contracts or collective bargaining agreements. *Nothing herein shall be construed to make any person ineligible to become a candidate for the board of education.* B. Any member of a board of education who violates the provisions of this section shall be subject to the penalties prescribed by Sections 485 and 486 of Title 21 of the Oklahoma Statutes. (Emphasis Added)

§ 5–113.1 cancels out the prohibition in § 5–113. That sentence is "Nothing herein shall be construed to make any person ineligible to become a candidate for the board of education." This requires us to analyze the meaning of the word "herein." "Herein" as used in legal phraseology is a locative adverb, and its meaning is to be determined from the context. It may refer to the single section, or to the chapter, or to the article, or to the whole enactment in which it is used. *Adams v. City of Hobart,* 27 P.2d 595, 597–98 (Okla.1933); *Gatliff Coal Co. v. Cox,* 142 F.2d 876, 882 (6th Cir.1944). This rule is applicable to the construction of a document as well as of a statute. *In re Pearson's Estate,* 98 Cal. 603, 33 P. 451, 453 (1893). As we read the two sections it is clear that "herein", as used in the critical sentence in § 5–113.1, relates to that section only, and not to the entire article on School Districts and Boards of Education commencing at § 5–101.

Our analysis is that Section 5–113 deals with the requirements for school board candidacy, whereas Section 5–113.1 focuses on the hiring of employees of the school district. Section 5–113 specifically states who is ineligible for candidacy. Section 5–113.1 specifically states who may be employed by the school district. Section 5–113.1 states that *it* is not to be construed to prevent an individual from being a candidate. But that statement does not lend itself to allowing family members to be candidates for school board. Instead we determine that it is an acknowledgement that school board eligibility requirements are governed by a separate statute, namely Section 5–113. In fact, it is clear that the intent behind Section 5–113 was to determine and set forth the eligibility requirements for individuals seeking to run for a seat on the school board. We find that the two provisions are consistent with one another.

Furthermore, we find that it is Section 5–113 which governs this case. Sharp did not seek employment with the school district; he sought an elected seat on the board. Thus, he is subject to the provisions of Section 5–113. According to the briefs of the parties, Sharp's wife is a teacher with the Jenks Independent School District. Under Section 5–113 he is ineligible to be a candidate for the school board, unless it is unconstitutional.

## THE CONSTITUTIONALITY OF THE STATUTES

■ Sharp's second argument is that if he is subject to Section 5–113, it is unconstitutional in that it violates his equal protection rights by impinging on his right to be a candidate for political office, and burdening the right to vote of all the registered voters in the district by limiting their choice of candidates. He urges that it is a violation of his equal protection rights because the statute, in its "grandfather clause," treats an incumbent board member differently from other candidates.

The United States Supreme Court has on many occasions confronted the question of the constitutionality of state election laws and laws regulating the eligibility to be a political candidate. The analysis begins with the recognition that the right to vote, the right to be associated with a political party and the right to be a political candidate are important and invaluable rights in our democracy. *Burdick v. Takushi,* 504 U.S. 428, ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992). "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders,* 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964).

Primarily, two different types of cases have emerged in this area: (1) "ballot access" cases which limit the candidate's access to the ballot and (2) "voter's rights" cases which limit the ability of the individual to participate in the voting process. Although the two are clearly different, the Supreme Court has "minimized the extent to which voting rights cases are distinguishable from ballot access cases, stating that 'the rights of voters and the rights of candidates do not lend themselves to neat separation.'" *Burdick,* 504 U.S. at ——, 112 S.Ct. at 2065–66, quoting *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972). In approaching restrictions on candidacy, "it is essential to examine in a realistic light the extent and nature of their impact on voters."

*Anderson v. Celebrezze,* 460 U.S. 780, 786, 103 S.Ct. 1564, 1568–69, 75 L.Ed.2d 547 (1982) quoting *Bullock,* 405 U.S. at 143, 92 S.Ct. at 855–56.

 Although the right to be a candidate is certainly an important right, it is not absolute, and cannot escape all regulation by the state. *Burdick,* 504 U.S. at ——, 112 S.Ct. at 2063; *Munro v. Socialist Workers Party,* 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986). Common sense dictates that the state government must structure elections and candidacy to a certain degree. "[A]s a practical matter there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974); *see also Burdick,* 504 U.S. at ——, 112 S.Ct. at 2063. Furthermore, the regulation of candidate eligibility has only an indirect impact on the rights of voters. *Bullock,* 405 U.S. at 143, 92 S.Ct. at 855–856. Here, it is not the absolute right to vote which is implicated, but it is the right to vote for a particular candidate. *See, e.g., Duke v. Cleland,* 954 F.2d 1526, 1531 (11th Cir.1992).

 While the right to vote is fundamental, the right to be a candidate is not. *Clements v. Fashing,* 457 U.S. 957, 963, 102 S.Ct. 2836, 2843–44, 73 L.Ed.2d 508 (1982) (plurality opinion); *see also Bullock v. Carter,* 405 U.S. at 143, 92 S.Ct. at 855–56.[3] The fact that a state sets regulations "tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny." *Bullock,* 405 U.S. at 143, 92 S.Ct. at 855–56; *Anderson v. Celebrezze,* 460 U.S. at 788, 103 S.Ct. at 1569–70.

Although these rights of voters are fundamental, *not all restrictions imposed by the*

States on candidates' eligibility for the ballot impose constitutionally suspect burdens on voters' rights to associate or to choose among candidates ... To achieve [fairness in elections], States have enacted comprehensive and sometimes complex election codes. *Each provision of these schemes,* whether it governs the registration and qualifications of voters, *the selection and eligibility of candidates,* or the voting process itself, *inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends. Nevertheless, the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.*

*Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70. (Emphasis added)[4] The states enjoy a "breadth of power" to regulate elections and candidacy, provided this power is to be exercised within the confines of the Equal Protection Clause. *Bullock,* 405 U.S. at 134, 92 S.Ct. at 851.[5]

 Traditional "equal protection" analysis requires that there be a fundamental right or a suspect classification before strict scrutiny will be employed. *Clements,* 457 U.S. at 963, 102 S.Ct. at 2843–44; *San Antonio Indep. School Dist. v. Rodriquez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).[6] In a situation such as the one at bar, where the statute does not impinge on a fundamental right, and when the classification used by the legislature is not based on a suspect class, the overlay of constitutional principles governing ballot access is called into play.

 Thus, when considering a challenge to a state election law, a court must

---

**3.** *See also Dr. John Hagelin for President Committee v. Graves,* 804 F.Supp. 1377 (D.Kan.1992); *Fasi v. Cayetano,* 752 F.Supp. 942 (D.Hawaii 1990).

**4.** The Federal Constitution recognizes the necessity of a state's regulation of elections to insure fairness in the democratic process of electing senators and representatives. Art. I, Section 4, cl. 1 provides that the state may prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives."

**5.** *See also Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Evans v. Cornman,* 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970).

**6.** In *Anderson,* 460 U.S. at 786–7 n. 7, 103 S.Ct. at 1568–69 n. 7, the Supreme Court recognized that in a number of election cases, the Court has decided the issue under the "fundamental right" strand of Equal Protection analysis.

weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate", against the interests of the state in enacting the provisions. *Burdick,* 504 U.S. at ——, 112 S.Ct. at 2063; *Tashjian v. Republican Party,* 479 U.S. 208, 213–14, 107 S.Ct. 544, 547–49, 93 L.Ed.2d 514 (1986). There is no absolute requirement that strict scrutiny, or any other level of scrutiny, be employed. The rigorousness of the inquiry depends on the extent to which the law burdens constitutional rights. There is no "litmus-paper test"— "the rule is not self-executing and is no substitute for the hard judgments that must be made." *Storer,* 415 U.S. at 730, 94 S.Ct. at 1279.[7]

■ Not every limitation or incidental burden on the right to vote or the right to be a candidate is "subject to a stringent standard of review." *Bullock,* 405 U.S. at 134, 92 S.Ct. at 851; *McDonald v. Bd. of Election Comm'rs,* 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969).[8] When the state imposes reasonable nondiscriminatory regulations, the state's interest in regulation of the electoral process will generally suffice to justify the restriction. *Burdick,* 504 U.S. at ——, 112 S.Ct. at 2063–64; *Anderson,* 460 U.S. at 788, 103 S.Ct. at 1569–70.[9]

*Clements v. Fashing* is particularly instructive on this issue.[10] In *Clements,* two California state constitutional provisions were questioned. These provisions regulated the eligibility of a political candidate by requiring that the candidate resign any public office before running for election for another office, and by requiring that certain officers complete their terms before declaring candidacy for another elected office. The Supreme Court stated that the burdens on the plaintiff's First and Fourteenth Amendments were insignificant, while the state's justification for the provisions were reasonable and nondiscriminatory. The provisions were not an absolute bar to candidacy; the potential candidate could change employment status to become eligible.

■ Reasonable classifications prescribing candidate qualifications, such as those based upon a person's age, integrity, training, residence and citizenship, have generally been upheld. *Id.,* citing *Kramer v. Union Free School District,* 395 U.S. 621, 625, 89 S.Ct. 1886, 1888, 23 L.Ed.2d 583 (1969), *Matter of Spencer v. Bd. of Educ.,* 39 A.D.2d 399, 334 N.Y.S.2d 783 (1972), *Landes v. Town of North Hempstead,* 20 N.Y.2d 417, 284 N.Y.S.2d 441, 443, 231 N.E.2d 120, 121–22 (1967). When deciding whether these limitations are constitutionally permissible, "it is essential to examine in a realistic light the extent and nature of their impact on voters." *Bullock,* 405 U.S. at 134, 92 S.Ct. at 851.

In *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1973), the Supreme Court upheld several California regulations which set eligibility requirements. These requirements included: (1) a prohibition of candidacy as an independent if the individual has been registered with a party less than 12 months preceding the primary election, and (2) nominating petitions containing signatures of at least 5% of the number of voters voting in the preceding general election. The Court upheld both of these eligibility requirements on candidacy. In so holding, the Court stated that states have a legitimate interest in regulating the number of candidates on the ballot to prevent the clogging of election machinery and the confusion of voters. *Id.* at 732.

The Tenth Circuit addressed a similar issue in *Rainbow Coalition v. Oklahoma State*

---

7. See also *Dunn v. Blumstein,* 405 U.S. 330, 348, 92 S.Ct. 995, 1005–06, 31 L.Ed.2d 274 (1972).

8. See also *Fletcher v. Marino,* 882 F.2d 605 (2nd Cir.1989); *Unity Party v. Wallace,* 707 F.2d 59 (2nd Cir.1983); L. Tribe, *American Constitutional Law* §§ 13–18 (2d.Ed.1988).

9. See also *LaRouche v. Kezer,* 990 F.2d 36 (2nd Cir.1993) (statutes upheld which regulated ballot access by a candidate of a minority party).

10. We realize that *Clements* is a plurality opinion, but find that the similarity of situations requires its consideration. Federal courts have relied on *Clements. See, e.g., Fletcher v. Marino, supra* in n. 8; *Dixon v. Maryland State Bd. of Election Laws,* 878 F.2d 776 (4th Cir.1989).

*Election Bd.,* 844 F.2d 740 (10th Cir.1988). The plaintiffs contended that they were denied equal protection under statutes which governed the process by which minority political parties are recognized by the state. They urged that the statutes denied them access to the ballot. The court began its analysis by noting that the United States Supreme Court "neither demanded a compelling state interest nor insisted that the state demonstrate it has achieved this end by the least restrictive means." *Id.* at 743. The state has an interest in seeing that the democratic processes run smoothly and may enact legislation to facilitate this goal. State laws requiring that a candidate, before he or she can be eligible for candidacy, submit signatures showing support, have been repeatedly upheld. *See Jennets v. Fortson,* 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Populist Party v. Herschler,* 746 F.2d 656 (10th Cir.1984). The Tenth Circuit upheld the constitutionality of the Oklahoma statutes regulating ballot access.

New York has addressed the issue of whether eligibility requirements on candidates for school boards were violative of equal protection. The court held that the state's regulation of candidacy requirements was constitutional. In *Rosenstock v. Scaringe,* 40 N.Y.2d 563, 388 N.Y.S.2d 876, 357 N.E.2d 347 (Ct.App.1976), the state's regulation barring the candidacy of individuals who were related to other members on the board was upheld. The court held that the regulation did not directly infringe on the right to vote, but only indirectly imposed on the right by narrowing the field of eligible candidates. Applying the rational basis test, the court held that the state's interest in preventing conflicts of interests which might arise from two family members on the same school board was sufficient to uphold the constitutionality of the regulations. *Id.* at 719.

Both the First and Second Circuit Courts of Appeal have upheld statutes similar to the one at bar. In *Campbell v. Lehman,* 728 F.2d 49 (1st Cir.1984), the plaintiff brought suit challenging a statute which prohibited any person who was related by blood or marriage to an employee of the school from being a candidate for school board. The plaintiff claimed that the statute was arbitrary. The court disagreed, stating that the statute served a legitimate interest in avoiding conflicts of interests.

In *Fletcher v. Marino,* 882 F.2d 605 (2nd Cir.1989), a statute prohibited certain municipal employees and officials from being school board members. Using a standard less than strict scrutiny, the court held that this statute ensured fairness in governmental service. *Id.* at 612. The court noted that if an individual wanted to be a school board member, he or she was not completely prohibited from running. The individual need only give up the current municipal position to be eligible to run.

In the present case we are concerned with an anti-nepotism statute which prohibits candidacy if the individual is related within the second degree to a school employee or another board member. Under Supreme Court guidance, we must first look to the extent and degree of limitation imposed upon candidacy. *Burdick,* 504 U.S. at —, 112 S.Ct. at 2063; *Tashjian,* 479 U.S. at 213–14, 107 S.Ct. at 547–49. The statute prohibits only individuals who are related within the second degree of consanguinity. It limits eligibility only during the time period that a family member is employed by the school district or is a member of the board. It is a non-discriminatory statute which prohibits certain individuals from being eligible for candidacy.

Sharp argues that it is a discriminatory statute as it treats incumbent board members differently from prospective candidates. The statute states that board members who were serving at the time this legislation was enacted are exempt from this prohibition. We have found no case in which the Supreme Court elevated "candidates" to the status of suspect or quasi-suspect class deserving special protection. "The Equal Protection Clause allows the States considerable leeway to enact legislation that may appear to affect similarly situated people differently." *Clements,* 457 U.S. at 962–63, 102 S.Ct. at 2843.

As for the state's interest in enacting an anti-nepotism statute, the intent is clear from the body of Section 5–113: And that is to prevent potential conflicts of interest and

avoid favoritism and the appearance of favoritism which could arise from family members serving as employees of each other. Other states have upheld similar statutes.

In *Parks v. City of Warner Robins*, 841 F.Supp. 1205 (M.D.Ga.1994), the federal district court upheld a municipal police department's policy of prohibiting nepotism within the department. Plaintiffs urged that the policy abridged the fundamental right to marry. The court disagreed, holding that the policy did not implicate a suspect class and affected the right of marriage only incidentally. "If governmental action 'does not affect a fundamental right or discriminate on the basis of a suspect classification, [the action is upheld] so long as it is rationally related to furthering a legitimate governmental interest.'" *Id.* at 1213, quoting *Henderson v. Scientific–Atlanta, Inc.*, 971 F.2d 1567, 1574 (11th Cir.1992) *cert. denied*, —— U.S. ——, 114 S.Ct. 95, 126 L.Ed.2d 62 (1992). The court concluded by holding that the policy furthered the municipality's interest in avoiding conflicts of interest, avoidance of the appearance of favoritism, and avoidance of family conflicts. The policy, rationally related to the objectives, was upheld.

*Townshend v. Board of Education*, 183 W.Va. 418, 396 S.E.2d 185 (1990), presented a challenge to the school board's policy prohibiting nepotism. Again, the plaintiffs claimed that the policy interfered with their fundamental right to marry. The court disagreed and pointed out that a majority of courts who addressed the nepotism question had upheld the policies.[11] The policies prevented conflicts of interests and the appearance of favoritism.

In *Parsons v. City of Del Norte*, 728 F.2d 1234 (9th Cir.1984) *cert. denied*, 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984), the Ninth Circuit upheld the sheriff department's policy of no nepotism. In so holding, the court refused to apply strict scrutiny for its Equal Protection analysis, and instead applied the rational basis test. The court concluded that the policy was within constitutional boundaries.

Sharp also urges that Section 5–113 is unconstitutional because the state's interest could have been furthered by less restrictive means. This argument fails because only under the strict scrutiny test is the state required to use the less restrictive means. *Anderson*, 460 U.S. at 788–89, 103 S.Ct. at 1569–70. And in the balancing test required by *Anderson*, the plaintiff's rights are weighed against the state's interest.

We hold that the statute, Section 5–113, is constitutional. The state's interest in avoiding conflicts of interest, avoiding favoritism and the appearance of favoritism, is sufficient to uphold the legitimate regulation of candidacy. While this Court holds sacred the right to vote and to participate in the political process as a candidate, we also recognize that the latter is not an absolute nor fundamental right, but that the state may impose reasonable, non-discriminatory regulations. We find Section 5–113 to be one of these reasonable, non-discriminatory impositions.

## CONCLUSION

The procedural posture of this case, coupled with our upholding of the constitutionality of Section 5–113, requires that we make this holding effective thirty days from the date the opinion becomes final. We do so to permit Sharp to resign his office without facing the penalties attached to the violation of Section 5–113.[12] The writ of mandamus previously issued is vacated, and the Petitioner stands ineligible to serve on the School

---

11. *Keckeisen v. Independent School District 612*, 509 F.2d 1062, 1066 (8th Cir.1975) *cert. denied*, 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975); *Cutts v. Fowler*, 692 F.2d 138, 139 (D.C.Cir. 1982); *Yuhas v. Libbey–Owens–Ford Co.*, 562 F.2d 496 (7th Cir.1977), cert. denied, 435 U.S. 934, 98 S.Ct. 1510, 55 L.Ed.2d 531 (1978); *Harper v. Trans World Airlines*, 525 F.2d 409 (8th Cir.1975); *Southwest Community Action Council Inc. v. Community Serv. Adm.*, 462 F.Supp. 289 (S.D.W.Va.1978); *Parsons v. Del Norte County,* 728 F.2d 1234 (9th Cir.1984), cert. denied, 469 U.S. 846, 105 S.Ct. 158, 83 L.Ed.2d 95 (1984); *Klanseck v. Prudential Ins. Co.*, 509 F.Supp. 13 (E.D.Mich.1980); *Thompson v. Sanborn's Motor Express Inc.*, 154 N.J.Super. 555, 382 A.2d 53 (1977); *Manhattan Pizza Hut, Inc. v. New York State Human Rights Appeal Board*, 51 N.Y.2d 506, 434 N.Y.S.2d 961, 415 N.E.2d 950 (1980).

12. See 21 O.S.1991 §§ 485 and 486.

Board effective thirty days from the date this ruling becomes final.

HODGES, C.J., LAVENDER, V.C.J., and SIMMS, WATT, JJ., concur.

HARGRAVE and ALMA WILSON, JJ., concur in result.

OPALA and KAUGER, JJ., concur in part; dissent in part.

## SUPPLEMENTAL OPINION ON REHEARING

LAVENDER, Justice:

Petitioner, Mark A. Sharp has requested rehearing of our opinion dated September 20, 1994. Respondent, Tulsa County Election Board and protestant, Hester Tyler White were afforded an opportunity to file responses to the petition by Order of this Court. Respondent filed a pleading waiving any response and protestant filed no response. We, therefore, rule on this matter without responses from respondent or protestant.

Petitioner asks for modification of our opinion to allow him to serve out the remainder of his term as a school board member for the Jenks public schools. He relies on a recent amendment to 70 O.S.Supp.1993, § 5–113 to support his position. The pertinent amendment was approved in June 1994 and can be found at 1994 Okla.Sess.Law Serv. Ch. 360, § 8 and is codified at 70 O.S.Supp. 1994, § 5–113. We grant rehearing and issue this supplemental opinion for the limited purpose of holding that petitioner be allowed to serve out the remainder of his term based on the recent amendment to § 5–113.

■ Between the time we initially granted the writ of mandamus requiring respondent to place petitioner's name on the ballot for the school board election and issuance of our opinion vacating that writ and allowing petitioner to resign his seat on the board within thirty (30) days from the date our opinion becomes final, the Legislature amended § 5–113. The relevant change as pertinent here is that the "grandfather"

clause contained in § 5–113 was amended to read as follows: "[The anti-nepotism] prohibitions shall not apply to prevent members of boards of education who are serving on September 1, 1994 from serving the term for which they were elected." (emphasis added). Basically, petitioner argues the plain words of the amendment apply to him because he was serving on September 1, 1994 a term on the school board for which he was elected in February 1994. We agree the amendment applies to petitioner's situation.[1]

In *American Insurance Association v. State Industrial Commission*, 745 P.2d 737 (Okla.1987), we held unless on review there is some liberty or property interest which requires us to apply to the accrued or vested rights in controversy the law in force at a fixed point in time prior to its most recent change, an amendment of controlling statutory law between the trial court and appellate decisions compels the appellate court to apply the latest version of the pertinent law. *Id.* at 740. In our view this principle applies to the instant matter.

■ The primary goal of statutory construction is to ascertain and follow the intention of the Legislature. *Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Commission*, 764 P.2d 172, 179 (Okla.1988). Further, the cardinal rule of statutory construction is to begin with the language used and courts should not read into a statute exceptions not made by the Legislature. *Id.* Here, the language of amended § 5–113 expressly provides that the anti-nepotism provisions of the statute shall not prevent members of boards of education who were serving in that capacity on September 1, 1994, from serving the remainder of the term for which they were elected. No exceptions are made by the Legislature.

Although petitioner most probably was only a *de facto* member of the board on September 1, 1994, the fact is that he was serving as a school board member on such date. Petitioner was in no different position on September 1, 1994 from any other school

---

1. In that we agree with petitioner's statutory argument it is unnecessary for us to discuss or rule on his alternative equitable argument to the

effect we have the authority to and should allow him to serve out the remainder of his term in the interest of the public.

board member who was in violation of the anti-nepotism provisions of § 5–113, but was serving as a board member on said date. The only difference in petitioner's case was that we issued a writ allowing him to be a candidate for such office because someone (Hester White Tyler) contested his candidacy. Such difference, in our view, is insufficient to warrant non-application of the new "grandfather" date to petitioner.

The bottom line here is that by extending the "grandfather" clause date from September 1, 1992 to September 1, 1994, the Legislature plainly expressed its intent to allow those board members serving on September 1, 1994, who were then in violation of the anti-nepotism provisions of § 5–113, to continue to serve the remainder of the term for which they were elected. In our view, this amendment expressly applies to petitioner because he was serving as a board member on such date.

Accordingly, we grant the petition for rehearing, apply amended § 5–113 to this matter and issue this Supplemental Opinion On Rehearing for the limited purpose of holding that petitioner be allowed to serve out the remainder of his term as a school board member. In conformity herewith petitioner need not resign his seat on the school board to avoid the penalties attached to violation of § 5–113 and he is not ineligible to serve on the School Board effective thirty (30) days from the date our opinion of September 20, 1994 becomes final. Except for the modifications set out herein our opinion of September 20, 1994 remains unchanged. IT IS SO ORDERED.